**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1058
_____

HELEN MINING COMPANY,
Petitioner

v.

*JAMES E. ELLIOTT, SR.*; DIRECTOR OFFICE OF
WORKERS' COMPENSATION PROGRAMS UNITED
STATES DEPARTMENT OF LABOR,
Respondents
_____

On Petition for Review of an Order of the
Benefits Review Board
(BRB-1:15-0067 BLA)
_____

Argued:
September 9, 2016

Before: JORDAN, VANASKIE, and KRAUSE, *Circuit Judges.*

---

* Amended per Clerk's Order of April 29, 2016.

(Filed: June 14, 2017)

_____

Christopher Pierson, Esq. (Argued)
Burns White
48 26th Street
Burns White Center
Pittsburgh, PA 15212
        *Attorney for Petitioner Helen Mining Co.*

Robert J. Bilonick, Esq.
Heath M. Long, Esq. (Argued)
Pawlowski Bilonick & Long
603 North Julian Street
P.O. Box 658
Ebensburg, PA 15931
        *Attorney for Claimant-Respondent James E. Elliott, Sr.*

Sean Bajkowski, Esq. (Argued)
Rae Ellen James, Esq.
Kathleen H. Kim, Esq.
United States Department of Labor
Office of the Solicitor
Room N-2117
200 Constitution Avenue, N.W.
Washington, DC 20210
        *Attorney for Federal Respondent Director, Office of
        Workers' Compensation Programs*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

The Black Lung Benefits Act (BLBA) confers on coal workers generally the right to claim workers' compensation benefits for disabilities arising out of coal dust exposure. 30 U.S.C. §§ 901–45. Typically, the burden of proof rests on the miner to establish each element necessary for entitlement to benefits. For miners who meet particular criteria, however, the BLBA provides that certain elements will be presumed, subject to rebuttal by the party opposing benefits, i.e., by the coal mine operator-employer, if identifiable, or, alternatively, by the Secretary of Labor. 30 U.S.C. § 921(c). At issue in this case is whether a 2013 regulation, specifying the standard a coal mine operator must meet to rebut the presumed element of disability causation, is *ultra vires* to the BLBA. *See* 20 C.F.R. § 718.305(d)(1) (2013). For the reasons set forth below, we agree with the Benefits Review Board's conclusion that operators are subject to the regulation's rebuttal standard because the regulation permissibly fills a statutory gap in the legislation. We also agree that the record adequately supports the ALJ's conclusion that the operator did not meet that rebuttal standard in this case. Accordingly, we will affirm the award of benefits and deny the operator's petition for review.

## I.     Background

Coal mine operator Helen Mining Company seeks review of an award of black lung benefits to Claimant-Respondent James E. Elliott, Sr. Before turning to the facts of this particular case, we briefly review the historical development of the relevant benefits scheme to give context to the challenges raised by Helen Mining in this appeal.

3

## A. Statutory and Regulatory Context

In 1969, Congress passed Title IV of the Federal Coal Mine Health and Safety Act, also known as the BLBA, to provide benefits to coal miners whose exposure to coal dust has resulted in the crippling pulmonary condition of pneumoconiosis, commonly known as "black lung." Pub. L. No. 91-173, § 401, 83 Stat. 742, 792 (1969) (codified as amended at 30 U.S.C. § 901); *see also Mullins Coal Co. of Va. v. Dir., OWCP*, 484 U.S. 135, 138 (1987).[1]  To prove entitlement to benefits, a miner must establish four elements: (1) disease, i.e., he has pneumoconiosis; (2) disease causation, i.e., the pneumoconiosis arose out of dust exposure from his coal mine employment; (3) disability, i.e., he has a totally disabling respiratory or pulmonary impairment that prevents him from performing coal mining or comparable work; and (4) disability causation, i.e., pneumoconiosis is a "substantially contributing cause" of his disability. 20 C.F.R. §§ 718.204(C)(1), 725.202(d)(2) (citing 20 C.F.R. §§ 718.201–718.204); *see also Dir., OWCP v. Mangifest*, 826 F.2d 1318, 1320 (3d Cir. 1987).  BLBA benefits were initially administered by the Social Security Administration, pursuant to regulations promulgated by the then-Secretary of Health, Education, and Welfare, and were paid from federal funds. 30 U.S.C. §§ 921–24; *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 683–84 (1991).  Today, such claims for BLBA

---

[1] The statutory scheme underlying entitlements to black lung benefits, as we have previously noted, "could hardly be more complicated," *Helen Mining Co. v. Dir., OWCP (Burnsworth),* 924 F.2d 1269, 1271–73 (3d Cir. 1991) (en banc), and we do not aspire here to a full exegesis, focusing instead on the provisions relevant to this case.

benefits are administered by the Director of the Office of Workers' Compensation Programs, pursuant to regulations promulgated by the Secretary of Labor. 30 U.S.C. §§ 902(c), 932; *Mullins*, 484 U.S. at 139.

Congress has amended the BLBA in numerous respects over the years, but three have particular relevance to this appeal. First, in an effort to relax the burden on miners to prove entitlement to benefits, the Black Lung Benefits Act of 1972 added a provision establishing that any miner who can prove he worked fifteen years or more in an underground coal mine and can establish the third element—that he is disabled—is entitled to "a rebuttable presumption that [he] is totally disabled due to pneumoconiosis" and is therefore entitled to black lung benefits. Pub. L. No. 92-303, § 4(c), 86 Stat. 150, 154 (codified at 30 U.S.C. § 921(c)(4)) (hereinafter "the § 921(c)(4) presumption"); *Pauley*, 501 U.S. at 685.[2] In essence, if a miner could prove qualifying employment and disability, then the other elements, including disability causation, would be presumed to be met as well, shifting the burden to the party opposing benefits—at that point in time, the Secretary—to rebut the presumption by means specified in § 921(c)(4). As to the element of disability causation, for example, § 921(c)(4) specified that the Secretary may rebut by "establishing that … [the miner's] respiratory or

---

[2] This rebuttable presumption specifically benefits miners whose pneumoconiosis is not sufficiently pervasive to manifest itself in a chest X-ray. *See* 30 U.S.C. § 921(c)(4). For miners who can prove the disease by chest X-ray, the presumption of entitlement to benefits is irrebuttable. 30 U.S.C. § 921(c)(3).

5

pulmonary impairment did not arise out of, or in connection with, employment in a coal mine." 30 U.S.C. § 921(c)(4)(B); *see also Pauley*, 501 U.S. at 685–86.[3]

Second, the BLBA from its inception had anticipated a gradual transition to the processing of claims by approved state workers' compensation programs or, in the absence of an approved program, by the Secretary himself, with mine operators bearing financial responsibility for the payment of benefits. *See* Federal Coal Mine Health and Safety Act of 1969, § 422, 83 Stat. 741, 796–97 (codified as amended at 30 U.S.C. § 932). But the 1972 Act set the date for that transition as January 1, 1974, providing that all claims filed on or after that date would be paid not from federal funds, but by the private coal mine operator that employed the miner, *see* Black Lung Benefits Act of 1972, § 5(1), (2), 86 Stat. 150, 155 (codified as amended at 30 U.S.C. § 932), and a subsequent amendment ensured that if a responsible operator could not be identified, benefits would be paid by a fund, administered by the Secretary, into which mine operators would contribute.[4] Thus, from that point forward,

---

[3] The statute provides, in the alternative, that the Secretary may rebut the presumption by disproving the disease element, specifically by "establishing that … [the miner claiming the presumption] does not, or did not, have pneumoconiosis." 30 U.S.C. § 921(c)(4)(A). This is the only other rebuttal method prescribed for the Secretary, and it is not relevant to this appeal.

[4] The Black Lung Disability Trust Fund was created by the Black Lung Benefits Revenue Act of 1977. *See* Pub. L.

6

the party opposing benefits would be not only the Secretary, but either the Secretary or the mine operator, depending on which was the payor.

Finally, in another amendment passed in 1977, Congress expanded the definition of pneumoconiosis beyond the class of clinical diseases recognized as pneumoconiosis (so-called "clinical pneumoconiosis") to include "any chronic dust disease of the lung … arising out of coal mine employment" (now referred to as "legal pneumoconiosis"). Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, sec. 2(a), § 402(b), 92 Stat. 95, 95 (codified at 30 U.S.C. § 902(b)); *see* 20 C.F.R. § 718.201(a). The upshot of this amendment, when considered together with § 921(c)(4), was that the disease and disease causation elements overlapped, so if the Secretary could not rebut the presumption by proving that the miner did not have a disease "arising out of coal mine employment" (elements one and two), 30 U.S.C. § 902(b); *see supra* note 3, then he could only rebut disability causation by showing that the miner's impairment did not result from that disease (element four). *See* 30 U.S.C. § 902(b).

Soon after these amendments took effect, however, "the number of black lung benefit claims soared," *B & G Constr. Co. v. Dir., OWCP*, 662 F.3d 233, 242 (3d Cir. 2011), leading Congress to reverse course and amend the § 921(c)(4) presumption so that it would no longer apply to claims filed on or after January 1, 1982, *see* Black Lung Benefits Revenue Act of 1981, Pub. L. No. 97, § 202(b)(1), 95 Stat. 1635, 1643. For the next several decades, miners applying for benefits

---

No. 95-227, §§ 2–3, 95 Stat. 11, 11–15 (1978) (codified as amended at 26 U.S.C. § 4121; 30 U.S.C. § 934).

7

under the Act could not claim the benefit of the § 921(c)(4) presumption.

With the Patient Protection and Affordable Care Act, however, Congress changed its mind once more and revived the § 921(c)(4) presumption for all claims filed after January 1, 2005 that were still pending on or after March 23, 2010. Pub. L. No. 111-148, § 1556(a), (c), 124 Stat. 119, 260 (2010). For the reasons explained, the party opposing benefits at this point in time could be either the Secretary or the mine operator. However, when Congress reinstated § 921(c)(4), it did not alter the original language of that provision. Thus, while the presumption would apply to any qualifying miner as against any opposing party, the statute still specified only how "the Secretary"—originally, the only opposing party—could rebut the presumed elements, and made no explicit provision for rebuttal by operators.

The following year, the Department of Labor promulgated a regulation to fill that gap and to expound on the rebuttal standard. 20 C.F.R. § 718.305 (2013) (hereinafter "the Regulation"); *see also* Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act: Determining Coal Miners' and Survivors' Entitlement to Benefits, 78 Fed. Reg. 59,102, 59,106–07 (Sept. 25, 2013).[5] The Regulation thus prescribes the means of rebuttal for any

---

[5] Although Elliott applied for benefits in 2012 and the Regulation was not promulgated until the following year, the Regulation "applies to all claims filed after January 1, 2005, and pending on or after March 23, 2010." 20 C.F.R. § 718.305(a) (2013). Thus, Helen Mining does not challenge its applicability to Elliott on this ground.

"party opposing entitlement" to benefits, encompassing both the Secretary and mine operators. 20 C.F.R. § 718.305(d)(1) (2013). And to rebut the presumed element of disability causation, the Regulation specifies that, short of disproving the presence of disease,[6] such opposing party must "[e]stablish[] that no part of the miner's respiratory or pulmonary total disability was caused by pneumoconiosis." 20 C.F.R. § 718.305(d)(1)(ii) (2013). Put another way, the opposing party must "rule out" any connection between pneumoconiosis and a miner's disability. *See Kline v. Dir., OWCP*, 877 F.2d 1175, 1179 (3d Cir. 1989) (describing a regulation with similar "no part" language as imposing a "rule out" standard). The validity of the Regulation and, in particular, its imposition of the rule out standard on mine operators, is the central issue on appeal.

## B.    Factual and Procedural History

Elliott worked in a coal mine for over twenty-three years, until 1993. During that time, he developed a chronic cough, and about three or four years after his retirement, he developed more acute breathing problems characterized by shortness of breath and chest pain. Elliott timely filed a claim for benefits under the BLBA in September 2012, alleging that he suffered from respiratory difficulties due to his coal mine employment. The Director of the United States Department of Labor, Office of Workers' Compensation Programs, issued

---

[6] Consistent with the alternate means of rebuttal provided by the statute, *see supra* note 3, the Regulation also provides that a party opposing the award of benefits may rebut the presumption by disproving the presence of the disease in its legal or clinical form. 20 C.F.R. § 718.305(d)(1)(i) (2013).

9

a proposed Decision and Order awarding benefits on June 4, 2013. Petitioner Helen Mining conceded it was the responsible employer, but it challenged Elliott's entitlement to benefits and requested a formal hearing before an Administrative Law Judge (ALJ).

At an April 2014 hearing before an ALJ, the parties stipulated that Elliott suffered from a totally disabling respiratory impairment. Because Helen Mining thus conceded disability and because Elliott demonstrated a term of employment greater than fifteen years,[7] the ALJ determined that § 921(c)(4) applied and that the other elements, including disability causation, would be presumed. Elliott thus was presumed totally disabled due to pneumoconiosis, and the ALJ shifted the burden to Helen

---

[7] The § 921(c)(4) presumption applies only if the miner's fifteen years of work were performed underground. *See* 30 U.S.C. § 921(c)(4). However, employment "in conditions substantially similar to those in underground mines" will qualify if the miner can demonstrate that he was "regularly exposed to coal-mine dust while working there." 20 C.F.R. § 718.305(b)(1)(i), (b)(2). Elliott worked underground for only ten years, but the ALJ credited his testimony regarding the "dusty conditions of his aboveground mining positions" and thus determined that he had shown enough total years of qualifying work to invoke the presumption. Helen Mining challenged this finding on its appeal to the Benefits Review Board, but the Board rejected it, and Helen Mining has waived the issue on appeal by failing to raise it in its opening brief to this Court. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

Mining to rebut the other elements as permitted by the Regulation.

As part of its effort to rebut the presumption, Helen Mining offered the opinions of Doctors Gregory Fino and Samuel Spagnolo, both of whom attributed Elliott's respiratory impairment to a diagnosis of adult-onset asthma unrelated to coal dust exposure. The ALJ did not find their testimony persuasive and concluded that Helen Mining had failed to rule out coal dust-induced pneumoconiosis as a cause of Elliott's disability and thus had failed to rebut the presumption. 20 C.F.R. § 718.305(d)(1).[8] He therefore awarded benefits to Elliott.

On appeal to the Benefits Review Board (the "BRB," or "the Board"), Helen Mining argued that the ALJ should not have required it to meet the rule out standard prescribed by the Regulation because the Regulation, which imposes that rebuttal burden on both operators and the Secretary, should be deemed *ultra vires* to the statute, which imposes it on the Secretary alone. The BRB rejected this argument, specifically holding that the Regulation is valid and that the ALJ was correct to apply it here because the Regulation

---

[8] Elliott also argued before the ALJ that he could establish disability causation even without the benefit of § 921(c)(4)'s presumption, and, to that end, he proffered testimony and reports of experts who had diagnosed him with qualifying diseases that they opined were caused, at least in part, from coal mine dust exposure. The ALJ did not find those experts persuasive either but concluded their opinions were inconsequential because the presumption did apply and Helen Mining did not satisfy the rule out standard to rebut it.

11

"fill[s] the statutory gap created by the omission of a specific reference to responsible operators, clarif[ies] ambiguous phraseology, and effectuate[s] the purposes of the Act, i.e., to compensate miners with fifteen or more years of coal mine employment who are disabled by pneumoconiosis." JA 10a. The Board proceeded to hold that the ALJ correctly applied that standard and that, having reasonably rejected the opinions of Helen Mining's medical experts, the ALJ properly concluded Helen Mining had failed to rebut the presumption. The Board therefore affirmed the ALJ's decision, and Helen Mining petitioned this Court for review.[9]

## II.     Jurisdiction and Standard of Review

The BRB had jurisdiction to review the ALJ's decision pursuant to 33 U.S.C. § 921(b)(3), as incorporated by 30 U.S.C. § 932(a). This Court has jurisdiction over this appeal because Elliott's exposure to coal mine dust occurred in

---

[9] Although the ALJ based his ruling on the Regulation, 20 C.F.R. § 718.305(d), which imposes the rule out standard on the party seeking to rebut disability causation, he also at several points described the presumption as establishing that pneumoconiosis was a "substantially contributing cause" of Elliott's disability. JA 29a–30a, 32a, 34a–35a. That language may have been imprecise, but it is clear that the ALJ in fact applied the rule out standard by requiring Helen Mining to provide medical evidence completely "disassociating" Elliott's disability from any coal dust-related disease and concluding Helen Mining had not met its burden under the Regulation. JA 34a. The Board affirmed that determination, and the application of the Regulation's rule out standard to operators is therefore squarely before us on appeal.

Pennsylvania, and 33 U.S.C. § 921(c), as incorporated by 30 U.S.C. § 932(a), allows an aggrieved party to seek review of a BRB decision in the U.S. Court of Appeals for the Circuit in which the injury occurred.

We review the Board's decision only to determine "whether an error of law has been committed and whether the Board has adhered to its scope of review." *Hill v. Dir., OWCP,* 562 F.3d 264, 268 (3d Cir. 2009) (quoting *Kowalchick v. Dir., OWCP,* 893 F.2d 615, 619 (3d Cir. 1990)). "We exercise plenary review over the ALJ's legal conclusions that were adopted by the Board." *Id.* Furthermore, "[t]he Board is bound by the ALJ's findings of fact if they are supported by substantial evidence," but if a petitioner challenges a finding of fact, "we must independently review the record and decide whether the ALJ's findings are rational, consistent with applicable law and supported by substantial evidence on the record considered as a whole." *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## III.    Discussion

Helen Mining raises on appeal the same two issues it raised before the Board. That is, first, it challenges the validity of the Regulation to the extent it imposes on operators (and not merely on the Secretary) the burden to rebut disability causation using the rule out standard, and second, it contends that even if the Regulation applies, it satisfied the rule out standard through expert medical evidence that the ALJ erroneously rejected. As explained below, we find each of these arguments unavailing.

13

## A.      Validity of Regulation

We first consider Helen Mining's challenge to the Regulation's imposition of the rule out standard on operators. In addressing the validity of a regulation promulgated through notice-and-comment procedures, we apply the familiar two-step analysis of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  If Congress has directly and clearly spoken to the precise question at issue, our *Chevron* analysis is complete at Step One, and Congress's unambiguously expressed intent controls.  *Chevron*, 467 U.S. at 842–43.  If, however, we determine that Congress has not addressed "the precise question at issue," whether by being "silent or ambiguous with respect to the specific issue" or by leaving "a gap for the agency to fill," then we must proceed to the second step and determine whether the agency's construction of the statute is reasonable.  *Chevron*, 467 U.S. at 843–44.[10]

---

[10] As a threshold matter, *Chevron* deference is only appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). The Secretary of Labor is authorized to promulgate rules and regulations necessary for the administration and enforcement of the BLBA, 30 U.S.C. § 936(a), and the parties do not challenge the exercise of that authority to promulgate the Regulation through notice-and-comment rulemaking here.

Even greater deference is due when Congress has left not merely an implicit gap for the agency to fill but has made an "express delegation of authority to the agency to elucidate

14

### 1. *Chevron* Step One

Helen Mining urges that the validity of the Regulation be resolved at Step One because, in its view, the requirement that operators rule out any connection between disease and disability is contrary to the intent of Congress as clearly and unambiguous expressed in § 921(c)(4).  In a nutshell, Helen Mining's argument is that: (a) by providing miners with a presumption described as "rebuttable," Congress confirmed that any opposing party—whether the Secretary or an operator—has the opportunity to rebut disability causation; (b) Congress expressly constrained the Secretary to rebut disability causation by "establishing that … [the miner's disease] did not arise out of, or in connection with, employment in a coal mine," 30 U.S.C. § 921(c)(4), and was silent as to the rebuttal standard for operators; *ergo* (c) Congress clearly and unambiguously intended to allow

_____

a specific provision of the statute by regulation," which then must be given "controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute."  *Chevron*, 467 U.S. at 843–44.  Arguably, that is the case here, for in addition to delegating general rulemaking, Congress directed the Secretary to, "by regulation[,] prescribe standards for determining … whether a miner is totally disabled due to pneumoconiosis," 30 U.S.C. § 921(b), and the standard for an operator to rebut a presumption that a miner is totally disabled due to pneumoconiosis could be viewed as falling in this category.  We do not reach this question, however, both because it was not addressed by the parties, and because we conclude that even applying the lesser deference afforded by the traditional two-step *Chevron* inquiry, the Regulation still stands.

operators to rebut disability causation without having to "establish[] that … [the disease] did not arise out of, or in connection with, employment in a coal mine," *id*. Building on this syllogism, Helen Mining reasons, the Regulation's rule out standard—interpreting § 921(c)(4) to require any party opposing benefits to "[e]stablish[] that no part of the miner's respiratory or pulmonary total disability was caused by pneumoconiosis," 20 C.F.R. § 718.305(d)(1)(ii)—is *ultra vires* to the extent it purports to apply to operators.

The flaw in Helen Mining's logic is apparent in its premise: The fact that Congress spoke explicitly to the rebuttal standard for the Secretary and was silent as to operators is the very reason we must conclude that Congress did not unambiguously reject or accept that rebuttal standard for operators. "[S]uch silence, after all, normally creates ambiguity. It does not resolve it." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002). And our inquiry is only resolved at *Chevron* Step One if "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842–43. Where, as here, Congress has not done so, and is instead "silent or ambiguous with respect to the specific issue," leaving "a gap for the agency to fill," controlling precedent directs that the agency is indeed empowered to fill that void. *Id.* The Regulation is a textbook example of an agency filling such a void, and its validity therefore must be addressed at *Chevron* Step Two.

This conclusion is reinforced when we consider § 921(c)(4) "in context," interpreting the statute to create "a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). The BLBA elsewhere provides that black lung

16

benefits are only available to miners who are disabled "due to" pneumoconiosis, 30 U.S.C. § 901(a)—language we previously recognized may invoke a broad range of meanings and thus does not clearly and unambiguously identify the standard for proving disability causation. *Bonessa v. U.S. Steel Corp.*, 884 F.2d 726, 728–29, 733 (3d Cir. 1989). At the time we examined the statute in *Bonessa*, the standard for a living miner to affirmatively prove disability causation had not yet been defined by regulation, so we imported the "substantially contributing cause" standard that had been articulated by the agency for survivors seeking death benefits, *id.* at 728–29, 733–34, and the agency subsequently incorporated that very standard into a new regulation directed at living miners who cannot claim the benefit of the presumption, 20 C.F.R. § 718.204(c); *see* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79.920, 79,948 (Dec. 20, 2000). Just as Congress's silence in § 901(a) created a void for the agency to set the causal standard for miners proving entitlement, *Bonessa*, 884 F.2d at 728, 733, so too did Congress's silence in § 921(c)(4) create a void for the agency to set the causal standard for operators seeking to rebut the presumption of entitlement. In neither case do we read that silence as an affirmative rejection or acceptance of a particular standard at *Chevron* Step One.[11]

---

[11] For that reason, Helen Mining fares no better in arguing that § 921(c)(4) reflects Congress's unambiguous adoption of a modified "substantially contributing cause" standard than it does in arguing that § 921(c)(4) reflects Congress's unambiguous rejection of the rule out standard. No doubt, construing the statute as a whole in the absence of the Regulation, Helen Mining's construction might have more

17

Helen Mining, however, contends that we are bound to do just that and to hold that Congress unambiguously rejected a rule out standard for miners in light of *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976). *Usery* considered a challenge by a group of operators to the § 921(c)(4) presumption soon after it was created by the Black Lung Benefits Act of 1972. *See id.* at 5, 11–12, 37. The operators argued that they should be permitted to oppose benefits without being subject to the statutory rebuttal standard imposed on the Secretary, and the Court agreed, reasoning that it was "clear as a matter of statutory construction that the [§ 921(c)(4)] limitation on rebuttal evidence is inapplicable to operators. By the language of [§ 921(c)(4)], the limitation applies only to 'the Secretary' and not to an operator seeking to avoid liability …." *Id.* at 35 (citing H.R. Rep. No. 92-1048, at 8 (1972) (Conf. Rep.); S. Rep. No. 92-780, at 8

---

traction, for there would be internal consistency in adopting as the standard by which operators must rebut disability causation when it is presumed, i.e., that pneumoconiosis was not a "substantially contributing cause" of the miner's disability, the inverse of the standard by which minors must establish disability causation in the absence of such a presumption, i.e., that pneumoconiosis was a "substantially contributing cause" of their disability. *See* 20 C.F.R. § 718.204(c)(1). But the Regulation adopts a different standard, *see* 20 C.F.R. § 718.305(d)(1)(ii), and at *Chevron* Step One, we look to whether the "administrative construction[] [is] contrary to clear congressional intent," *Chevron*, 467 U.S. at 843 n.9, not whether the statute could reasonably be construed another way "in the absence of an administrative interpretation" *id.* at 843.

18

(1972) (Conf. Rep.); S. Rep. No. 92-743, at 12 (1972)).[12] The Court went on to note, however, that it was not addressing whether a regulation could permissibly fill that gap in the law, and while it acknowledged that the Secretary had promulgated an implementing regulation that appeared to apply to claims payable by operators, it declined to consider the validity of that regulation because it had not been raised by the parties. *Id.* at 37. In short, by establishing that the statute is silent as to operators and leaving open the

---

[12] We also note that this holding from *Usery* has little bearing on the statute as it operates today, given the statutory amendments that have been passed since the time of that decision. At the time *Usery* was decided, only disabilities caused by clinical pneumoconiosis were compensable under the Act, and therefore the statutory rebuttal methods were truly limiting in that they did not allow a party to rebut the causal element by proving that a miner was not entitled to benefits because he was disabled by some other coal dust-induced lung disease that was not clinical pneumoconiosis. *See Usery*, 428 U.S. at 34–35. Now, however, the statute has been amended to cover benefits for disabilities arising from any "chronic dust disease of the lung and its sequelae … arising out of coal mine employment," known as "legal pneumoconiosis." Black Lung Benefits Reform Act of 1977, Pub. L. No. 95-239, § 2(a), 92 Stat. 95, 95 (codified at 30 U.S.C. § 902(b)); 20 C.F.R. § 718.201(a)(2). Because all totally disabling lung diseases caused by coal dust exposure are now covered under the Act, the operators' concerns expressed in *Usery* that they would be prohibited from presenting relevant evidence to rebut the link between pneumoconiosis and disability no longer pertain. *See W. Va. CWP Fund v. Bender*, 782 F.3d 129, 139 (4th Cir. 2015).

possibility that this silence could be filled by regulation, *Usery*, if anything, confirms that this question may not be resolved at *Chevron* Step One.[13]

Having concluded that § 924(c) is "silent or ambiguous" as to the rebuttal standard for operators and that Congress has not "directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842–43, we must proceed to consider the Regulation at Step Two of the *Chevron* analysis.

## 2.   *Chevron* **Step Two**

At Step Two, we consider whether the agency's regulation that fills a statutory gap is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. We must still at this stage consider the plain language of the statute, along with its origin and purpose, in reviewing the reasonableness of the regulation, *see Zheng v. Gonzales*, 422 F.3d 98, 119 (3d Cir. 2005), but if the regulation reflects a reasonable statutory interpretation, we will defer to that

---

[13] Helen Mining also highlights Judge Niemeyer's reliance on *Usery* in his concurrence in *Mingo Logan Coal Co. v. Owens* to argue that the plain language of the statute permitted an operator to rebut using a "substantially contributing cause" standard. 724 F.3d 550, 560–61 (4th Cir. 2013) (Niemeyer, J., concurring). That concurrence, however, was published about two months before the Regulation went into effect, and the Fourth Circuit subsequently considered and affirmed the validity of the Regulation, noting that Judge Niemeyer's concurrence in *Owens* "did not consider the language of any regulation." *Bender*, 782 F.3d at 140 n.12.

construction, even if we may have interpreted the statute otherwise, *Chevron*, 467 U.S. at 843 n.11.

Here, Helen Mining devoted the bulk of its briefing and argument to *Chevron* Step One, only weakly contesting the reasonableness of the Regulation.[14]  And for three good reasons.

First, the Regulation furthers Congress's goals in enacting § 924(c).  The sequence of legislative amendments here—the enactment of § 924(c) specifying the presumption and the means of rebuttal for "the Secretary" at a time when the Secretary was the only payor, the repeal of § 924(c), and its eventual revival at a point in time when operators were the primary payors—itself suggests that Congress may well have intended § 924(c) to reach any party opposing benefits and that its failure to further amend the statute upon reinstatement

---

[14] At some points Helen Mining appears to concede Step Two.  *See* Oral Argument at 14:38 (No. 16-1058), *available at* http://www.ca3.uscourts.gov/oral-argument-recordings (responding to question whether Helen Mining disputes the reasonableness of the regulation at *Chevron* Step Two by stating, "Not based on the case law that's out there.  No.").  However, at other points it appears to argue that a more reasonable interpretation of § 921(c)(4) would require operators to meet the "substantially contributing cause" standard required for miners not entitled to the presumption.  Pet'r's Br. 28–29 (citing 20 C.F.R. § 718.204(c)(1)).  Reasonable as it may be however, *see supra* note 11, Helen Mining's interpretation does not render the agency's different interpretation an unreasonable one.  *See Chevron*, 467 U.S. at 843 n.11.

to include operators "reflects nothing more than a drafting error" that "needs common sense revision." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625 (3d Cir. 2015). That is to say, the Regulation can be viewed not merely as a reasonable construction of an ambiguous statute, but as the proper construction of the statute as Congress intended it. That conclusion is reinforced when we consider that Congress imposed § 924(c)(4)'s presumption because Congress had become "[d]issatisfied with the increasing backlog of unadjudicated claims and the relatively high rate of claim denials" under the original Act, *Pauley*, 501 U.S. at 685, and it sought to give preference to those miners most at risk for disease because of their long-term coal dust exposure, *see* S. Rep. No. 92-743, at 11 (1972). Placing a heightened burden on the party seeking to overcome the presumption—whether that party is the Secretary or the operator—reinforces that preference and expedites the processing of these claims.

Second, we have long approved of the rule out standard as a reasonable burden of proof for operators seeking to disprove disability causation and to avoid paying black lung benefits. In *Carozza v. U.S. Steel Corp.,* 727 F.2d 74 (3d Cir. 1984), for example, we addressed a similar regulation that required operators to rule out a connection between disability and pneumoconiosis in order to overcome an interim presumption.[15] Recognizing that pneumoconiosis

---

[15] Although this case predated *Chevron*, we employed an analysis that closely tracked the test eventually adopted by the Supreme Court in that case. *See Carozza*, 727 F.2d at 78; *Chevron*, 467 U.S. at 842–43. The interim presumption that was at issue was established by a now-superseded Department of Labor regulation under the Black Lung

22

may contribute to a miner's disability by aggravating other non-work-related conditions, we held that the Secretary's decision to require a party opposing benefits to rule out even such a slight connection between pneumoconiosis and disability was in accord with workers' compensation principles, "consistent with the remedial purposes of Congress[,] and well within the rulemaking authority conferred on the Secretary." *Id.* at 78 & n.1; *see also Kline*, 877 F.2d at 1178–79.

Third, it is particularly appropriate for us to defer to the agency's interpretation of this statute because it forms the basis for a complex regulatory scheme. While some distinguished jurists have recently raised thought-provoking questions about the proper bounds of *Chevron* and judicial deference, *see, e.g.*, *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 278–83 (3d Cir. 2017) (Jordan, J., concurring in the judgment); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151–55 (10th Cir. 2016) (Gorsuch, J., concurring), there remains general consensus that such deference is appropriate where the agency oversees a "complex and highly technical"

---

Benefits Reform Act of 1977 and established that any miner who worked for at least ten years and could demonstrate one of a list of medical criterion was presumed to be disabled due to pneumoconiosis. *See Carozza*, 727 F.2d at 76 (citing 20 C.F.R. § 727.203(a) (1983)); *Pauley*, 501 U.S. at 688–89. Like the Regulation here, the Department of Labor regulation also provided that the party opposing benefits could rebut the presumption by establishing that "the total disability or death of the miner did not arise *in whole or in part* out of coal mine employment." 20 C.F.R. § 727.203(b)(3) (1983) (emphasis added); *see also Pauley*, 501 U.S. at 688–89.

23

regulatory program, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), or has particular substantive expertise and specialized experience, *see FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782–84 (2016); *Egan*, 834 F.3d at 281–82 (Jordan, J., concurring).[16]  Here, as the Supreme Court observed, the BLBA created a "highly technical regulatory program," and "[t]he identification and classification of medical eligibility criteria" for that program "necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." *Pauley*, 501 U.S. at 697.  In promulgating the Regulation, the agency applied that experience and judgment to weigh the competing standards and to adopt the rule out standard.  *See* Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act: Determining Coal Miners' and Survivors' Entitlement to Benefits, 78 Fed. Reg. 59,102, 59,106–07 (Sept. 25, 2013).  While Helen Mining's "substantially contributing cause" standard may also be reasonable, "the

---

[16] *See, e.g., ECM BioFilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017); *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 264 (5th Cir. 2017); *Defenders of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017); *Compassion Over Killing v. FDA*, 849 F.3d 849, 856 (9th Cir. 2017); *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 86 n.17 (3d Cir. 2017); *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016); *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016); *Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 77 n.7 (1st Cir. 2016); *WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015); *Bender*, 782 F.3d at 142; *Draper v. Colvin*, 779 F.3d 556, 560 (8th Cir. 2015); *Davis v. Producers Agric. Ins. Co.*, 762 F.3d 1276, 1286 (11th Cir. 2014).

Secretary's interpretation need not be the best or most natural one … to warrant deference," *Pauley*, 501 U.S. at 702, and we cannot say that the heavier burden that the Regulation places on operators is unreasonable.

For all of these reasons, we hold that the Regulation is a permissible exercise of the Secretary's rulemaking power and join the other Courts of Appeals that consistently have reached that conclusion. *See Bender*, 782 F.3d at 143; *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1071 n.5 (6th Cir. 2013); *cf. Antelope Coal Co./Rio Tinto Energy Am. v. Goodin*, 743 F.3d 1331, 1347 (10th Cir. 2014) (declining to address the operator's *ultra vires* argument).

## B.     Application of the Regulation to this Case

Assuming the validity of the Regulation, Helen Mining also argues that it produced evidence sufficient to rebut the § 921(c)(4) presumption even under the rule out standard, and that the ALJ only concluded it did not because he improperly rejected Helen Mining's medical expert testimony. In reviewing an ALJ's interpretation of expert medical evidence, we bear in mind that "[t]he Board is bound by an ALJ's findings of fact if they are supported by substantial evidence," and therefore we must review the record to "decide whether the ALJ's findings are supported by substantial evidence," defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Kowalchick*, 893 F.2d at 619–20. "Physicians' reasoning, consideration of records, and credentials are relevant to an ALJ's determination" whether to reject medical expert opinions, and an ALJ may properly reject such opinions if they are "inadequately explained, insufficiently reasoned, or

25

contrary to clinical evidence." *Balsavage v. Dir., OWCP*, 295 F.3d 390, 396–97 (3d Cir. 2002).

The error ascribed by Helen Mining is twofold: first, that the ALJ discredited its experts based on a misunderstanding of the Preamble to a relevant regulation and, second, that the ALJ mischaracterized a portion of one expert's testimony. We address each argument in turn.

First, Helen Mining argues that the ALJ incorrectly deemed its experts' testimony to conflict with the Preamble to the 2001 revision to 20 C.F.R. § 718.201 (hereinafter "the Preamble"). *See* Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79,920, 79,939 (Dec. 20, 2000). The testimony at issue is that of Dr. Fino—opining that Elliott was disabled by asthma and that dust exposure from coal mine employment could not be the source of that impairment because asthma cannot be caused by coal dust inhalation—and that of Dr. Spagnolo—opining that Elliott had asthma that impaired his lung function but could not be due to coal dust exposure because prior coal dust exposure would "probably not" aggravate asthma once a worker left the mine. The ALJ determined that these opinions were entitled to little weight, in part because they contradicted the Department's findings on the connection between asthma and coal dust exposure as reflected in the Preamble. The relevant section of the Preamble reads:

> The term "chronic obstructive pulmonary disease" (COPD) includes three disease processes characterized by airway dysfunction: chronic bronchitis, emphysema and asthma.

Airflow limitation and shortness of breath are features of COPD, and lung function testing is used to establish its presence. Clinical studies, pathological findings, and scientific evidence regarding the cellular mechanisms of lung injury link, in a substantial way, coal mine dust exposure to pulmonary impairment and chronic obstructive lung disease.

65 Fed. Reg. at 79,920, 79,939.

This Preamble reflects the agency's assessment of medical and scientific evidence upon which it relied in drafting the 2001 revision to the regulatory definition of pneumoconiosis. *Id.* at 79,920, 79,939. Because an "ALJ should reject as insufficiently reasoned any medical opinion that reaches a conclusion contrary to objective clinical evidence without explanation," *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986), an ALJ may reasonably rely on the agency's findings expressed in the Preamble in determining how much weight to assign to an expert's opinion, *see Helen Mining Co. v. Dir., OWCP (Obush)*, 650 F.3d 248, 257 (3d Cir. 2011).

Here, the ALJ observed that the agency had already recognized a proven link between coal dust exposure and pulmonary impairments like asthma, and he reasonably interpreted the opinions of Drs. Fino and Spagnolo as being contrary to that position. Although at times the Preamble references broad categories of respiratory diseases, it specifically cites at least one example of a study that demonstrates the link between coal dust exposure and asthma. *See* 65 Fed. Reg. at 79,943. Tellingly, the Preamble also

27

explicitly identifies Dr. Fino as an expert known to disagree with the conclusions expressed in the Preamble and explains that the agency does not credit his opinion because it is not "in accord with the prevailing view of the medical community or the substantial weight of the medical and scientific literature." 65 Fed. Reg. at 79,939. Neither of Helen Mining's experts cited a scientific study or treatise to challenge the agency's assessment or to support their conclusions that coal dust inhalation would not cause asthma or aggravate it after leaving work in the mines. We therefore conclude, as the BRB did, that the ALJ's findings in this respect were supported by substantial evidence. *See Obush*, 650 F.3d at 256–57.

Second, Helen Mining argues that the ALJ mischaracterized Dr. Fino's testimony as internally inconsistent and improperly discounted it on that basis. Our own review of the record assures us that the ALJ's discounting of this testimony on the basis of its internal discrepancies is also supported by substantial evidence. Dr. Fino acknowledged that Elliott reported the onset of his cough while working in the mines, and he conceded that the cough may have then been associated with coal dust; at the same time, however, Dr. Fino attributed Elliott's cough to asthma that he "believe[d]" began after Elliott left the mines. JA 77a. We agree with the ALJ that Dr. Fino did not adequately explain those inconsistencies.

Helen Mining now attempts to supply such an explanation by distinguishing Elliott's prior cough due to coal dust exposure from his current symptoms, which Helen Mining describes as shortness of breath due to asthma. But that cannot be reconciled with Dr. Fino's testimony—which

28

refers to both the coughing "[t]hat began while [Elliott] was working in the mines" and "the cough that he's having now" and states that "it's all due to asthma." JA 77a:6-14, 78a:2-4. Rather, the record, in view of Dr. Fino's failure to disassociate that cough from coal dust exposure, supports the ALJ's discounting of Dr. Fino's persuasiveness. *See Mancia v. Dir., OWCP*, 130 F.3d 579, 593 (3d Cir. 1997).

In sum, the ALJ did not err in rejecting the medical expert testimony of Helen Mining's experts, and absent that testimony, the record does not otherwise provide a basis to rebut the presumption of Elliott's entitlement to benefits. Accordingly, we agree with the BRB that the ALJ's conclusion that Helen Mining failed to overcome the § 921(c)(4) presumption was supported by substantial evidence. *See Kowalchick*, 893 F.2d at 619; *Lango v. Dir., OWCP*, 104 F.3d 573, 576–78 (3d Cir. 1997).

## IV.    Conclusion

Because we conclude that the Regulation's imposition of a rule out standard on operators is not *ultra vires* to the BLBA, and because we conclude the ALJ did not err in rejecting the only evidence Helen Mining proffered to rebut the § 921(c)(4) presumption in this case, we will deny the petition for review.

29